STATE OF NEBRASKA, APPELLEE, V. ARTHUR H. BARKER, APPELLANT.

420 N.W.2d 695

Filed March 18, 1988.   No. 87-095.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns, for appellant.

Robert M. Spire, Attorney General, and LeRoy W. Sievers, for appellee.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and BRODKEY, J., Retired, and COLWELL, D.J., Retired.

SHANAHAN, J.

Although the information charged Arthur H. Barker with murder in the second degree, see Neb. Rev. Stat. § 28-304 (Reissue 1985), the jury found Barker guilty of the

lesser-included offense of manslaughter, see Neb. Rev. Stat. § 28-305 (Reissue 1985), concerning the death of Patricia A. Pappas. As his sole assignment of error, Barker contends that the sentencing judge should have recused himself, as requested by Barker, on account of the judge's ex parte contact with members of the victim's family. Barker's contention presents a question of first impression in Nebraska. We set aside the sentence imposed on Barker and remand this matter for a sentence hearing and imposition of sentence on Barker.

Shortly after the verdict was announced in court, the prosecutor approached the trial judge and informed the court that the victim's parents and sister wished to visit with the judge because the victim's family were nonresidents of Nebraska. The judge conferred with the prosecutor and Barker's lawyer, informing counsel about the family's wish. Barker's lawyer objected to the court's meeting with the victim's family. The prosecutor and Barker's lawyer declined to attend the meeting requested by the family. Apparently in chambers, the judge met with the victim's parents and sister in the absence of counsel and without recording what transpired at that meeting.

Later, immediately before the sentence hearing, for which the presiding judge was the same judge who had visited with the victim's family, Barker's lawyer requested that the judge recuse himself in view of the meeting in question and its prejudice to Barker regarding any prospective sentence. In connection with Barker's request for recusal, the judge recounted what had transpired during his meeting with the victim's family. According to the court, the family was "overwrought" and "upset by the verdict being manslaughter and not second-degree murder." In the course of the meeting, the judge suggested that the family write him so that "first of all, their thoughts could be disclosed in a rational way, and secondly, it would be available to Counsel as well as to the Court." The judge further expressed:

> The Court was in no way prejudiced by the meeting with the family and as far as the Court's reassessing its own ability to be fair and consider all the facts and circumstances in this case, its opinion and judgment would not be colored at all by the visit had with the family.

In refusing to recuse himself from the sentence hearing, the judge stated: "Based upon the statements made by the Court on the record at the time you referred to on the record, the Court sees no basis or grounds to recuse itself from this matter."

The presentence report on Barker does not contain any correspondence from the victim's family, although the record indicates that such correspondence was sent by the family. Therefore, in the form presented by this appeal, the record does not contain a verbatim record of the judge's visit with the victim's family, but reflects the judge's characterization or description of what transpired at that meeting. At the sentence hearing, which was attended by members of the victim's family, neither the State nor Barker presented evidence regarding the sentence to be imposed. After counsel's comments, the court sentenced Barker to imprisonment for a term of 6 ⅔ to 20 years, which is the maximum penalty of imprisonment prescribed for manslaughter, a Class III felony. See Neb. Rev. Stat. § 28-105(1) (Reissue 1985).

To counter Barker's claim that the trial judge should have recused himself as a result of meeting with the victim's family, the State argues that "[s]ince the appellant has not shown that the sentencing judge was in any way influenced by his contact with the victim's family, there was no error in the refusal of the judge to recuse himself from sentencing [Barker]." Brief for Appellee at 8-9.

> [I]t is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. . . . The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process.

*Gardner v. Florida*, 430 U.S. 349, 358, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977).

While consideration of questions reaching constitutional dimensions is unnecessary for disposition of Barker's appeal, the expression in *Gardner, supra*, does emphasize the unquestioned importance of the sentencing process in the criminal justice system.

Characterizing the burden of proof for a motion to

disqualify a judge, we have stated: " ' "A party seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality." ' " *State v. Dondlinger*, 222 Neb. 741, 751, 386 N.W.2d 866, 872 (1986) (quoting from *State v. Gillette*, 218 Neb. 672, 357 N.W.2d 472 (1984)).

> "A motion to disqualify a trial judge on account of prejudice is addressed to the sound discretion of the trial court. . . . Generally, the ruling on a motion to disqualify a trial judge on the ground of bias and prejudice will be affirmed on appeal unless the record establishes bias and prejudice as a matter of law."

*State v. Dondlinger, supra* at 751, 386 N.W.2d at 872-73 (quoting from *In re Estate of Odineal*, 220 Neb. 168, 368 N.W.2d 800 (1985)).

To support its argument, the State directs us to *The People v. Hicks*, 44 Ill. 2d 550, 256 N.E.2d 823 (1970), which involved a conviction for murder and the trial judge's unsolicited ex parte contact with a prospective witness, who was alleged to be a relative of the homicide victim and who asked to be allowed to sit in the front of the courtroom. The Illinois Supreme Court found that the questioned contact did not prevent a fair trial for the defendant and explained:

> In our opinion the judge's conversations with [the prospective witness] . . . did not give cause for his disqualification, or give rise either to unfairness or a probability of unfairness which fatally infected the trial. Most certainly the occurrences relied upon do not support the major premise of defendant's argument here, *viz.*, that the judge "entertained members of the deceased's family in his chambers prior to trial." To say that any involuntary meeting or conversation, no matter how trivial, gives rise to cause for disqualification would present too easy a weapon with which to harass the administration of criminal justice and to obtain a substitution of judges.

44 Ill. 2d at 557, 256 N.E.2d at 827.

The State also suggests that *People v. Dunigan*, 96 Ill. App. 3d 799, 421 N.E.2d 1319 (1981), is applicable regarding recusal of a sentencing judge. After the jury found Dunigan guilty of

several felonies, the judge fortuitously met the victims at a local tavern and discussed "generalities" with them, which did not relate to any aspect of Dunigan's trial. In *Dunigan* the court expressed: "[T]he involuntary meeting that occurred between the judge and the victims of the crime did not, in itself, disqualify him from presiding at the sentencing hearing." 96 Ill. App. 3d at 813, 421 N.E.2d at 1330.

The State believes that the appropriate standard to determine whether prejudice has resulted from an ex parte communication with a presiding judge is expressed in *State ex rel. Irby v. Israel*, 100 Wis. 2d 411, 302 N.W.2d 517 (1981): "An ex parte communication, moreover, is a material error only if the adverse party is prejudiced by an inability to rebut the facts communicated and if improper influence on the decision maker appears with reasonable certainty to have resulted." 100 Wis. 2d at 425, 302 N.W.2d at 525.

Finally, the State then refers to *State v. Packett*, 206 Neb. 548, 294 N.W.2d 605 (1980), in which a prosecutor initiated an ex parte communication with the trial judge and complained about the latitude extended to the defendant's lawyer on cross-examination. Finding that the ex parte contact did not warrant reversal of the defendant's conviction, this court stated:

> It would appear that objections to, arguments about, or evidence affecting the limits of cross-examination ought to be made only in the presence of, or after appropriate notice to, opposing counsel. In this case, however, there is nothing in the record from which it may be reasonably inferred that prejudice resulted to the defendant. The record does not show that the defense was subsequently improperly restricted in either direct or cross-examination.

206 Neb. at 552, 294 N.W.2d at 608.

To counter the State's argument, Barker calls our attention to cases such as *State v. Valencia*, 124 Ariz. 139, 602 P.2d 807 (1979). In *Valencia*, which was a murder case, a relative of the homicide victim contacted the judge before sentencing and suggested what penalty should be imposed in view of the defendant's other convictions. In determining that the

sentencing judge, when requested by the defendant, should have recused himself from the sentence hearing, the Arizona Supreme Court, holding that a judge should not initiate, invite, or consider ex parte communication concerning a pending or impending proceeding before the judge, concluded that "[s]uch a rule is a requisite to the orderly administration of justice in any judicial system." 124 Ariz. at 140, 602 P.2d at 808. See, also, *State v. Leslie*, 136 Ariz. 463, 666 P.2d 1072 (1983) (after the jury found defendant guilty but before sentencing, the judge solicited contact with the victim's relatives; held: contact with the victim's relatives necessitated the judge's disqualification from the proceedings).

The cases presented by the State regarding a judge's ex parte communication are readily distinguishable from the situation now before us, that is, Barker's case involves an ex parte communication which was responsively invited by the sentencing judge and, therefore, was a voluntary and intentional or deliberate meeting between the sentencing judge and the victim's family. If a litigant should not have to face a judge when there is a reasonable question of the judge's impartiality, none would rationally deny the validity of the general rule expressed in *State v. Valencia, supra*: A judge should not initiate, invite, or consider an ex parte communication concerning a pending or impending proceeding before the judge.

After Barker's conviction, the focal point of the proceedings became the sentence hearing, a proceeding in which a sentencing judge should display equanimity. An ex parte communication, as an extrajudicial source of information imparted to a judge, reasonably raises a question about the judge's impartiality in disposing of questions germane to the subject of the extrajudicial communication. Therefore, we hold that a judge, who initiates or invites and receives an ex parte communication concerning a pending or impending proceeding, must recuse himself or herself from the proceedings when a litigant requests such recusal.

Why is there no requirement that a litigant must show a judge's prejudice from a judicially initiated or invited ex parte communication? For the rule we have adopted today, a

rationale lies within Neb. Evid. R. 605: "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." Neb. Rev. Stat. § 27-605 (Reissue 1985).

Neb. Evid. R. 605 is a verbatim counterpart of Fed. R. Evid. 605. The advisory committee's note supplies insight into the purpose of Fed. R. Evid. 605 and, correspondingly, Neb. Evid. R. 605:

> The solution here presented is a broad rule of incompetency, rather than such alternatives as incompetency only as to material matters leaving the matter to the discretion of the judge, or recognizing no incompetency. The choice is the result of inability to evolve satisfactory answers to questions which arise when the judge abandons the bench for the witness stand. Who rules on objections? Who compels him to answer? Can he rule impartially on the weight and admissibility of his own testimony? Can he be impeached or cross-examined effectively? Can he, in a jury trial, avoid conferring his seal of approval on one side in the eyes of the jury? Can he, in a bench trial, avoid an involvement destructive of impartiality? . . .
>
> The rule provides an "automatic" objection. To require an actual objection would confront the opponent with a choice between not objecting, with the result of allowing the testimony, and objecting, with the probable result of excluding the testimony but at the price of continuing the trial before a judge likely to feel that his integrity had been attacked by the objector.

Fed. R. Evid. 605 advisory committee's note.

According to Weinstein, "Rule 605 was drafted as a broad rule of incompetency designed to prevent a judge presiding at a trial from testifying as a witness in that trial on any matter whatsoever." 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 605[01] at 605-3 (1987).

An explanation for Rule 605 is found in the observation by McCormick: "[W]hen a judge is called as a witness in a trial before him, his role as witness is manifestly inconsistent with his customary role of impartiality in the adversary system of trial."

McCormick on Evidence § 68 at 164 (E. Cleary 3d ed. 1984).

As noted in *Terrell v. United States*, 6 F.2d 498, 499 (4th Cir. 1925):

> "Indeed, a judge presiding at a trial is not a competent witness, for the duties of a judge and a witness are incompatible. If he testifies he would have to pass upon the competency of his own testimony; and as a witness he might be regarded a partisan, and would be subject to embarrassing conflicts with counsel. The danger to the dignity of the bench, of subjecting its impartiality to doubt and of placing the defendant at an unfair disadvantage by admitting the presiding judge as a witness is very obvious. . . ."

Although a judge is not sworn as a witness, Neb. Evid. R. 605 contains a bar to the judge's testifying and disqualifies the judge as a competent witness in proceedings over which the judge presides. See *Cline v. Franklin Pork, Inc.*, 210 Neb. 238, 313 N.W.2d 667 (1981). See, also, *Terrell v. United States, supra* (questioning by a judge amounted to his testifying). Weinstein also concludes that a judge acts as a witness within the purview of Rule 605, although the judge does not formally take the witness stand:

> During a trial, a judge, although he is neither called to testify nor voluntarily takes the stand, may nevertheless assume the role of a witness. Such behavior by a judge is at variance with the policy expressed in Rule 605 and should be treated analogously to direct violation of the Rule. That is, the appellate court must examine the particular circumstances of the case to determine whether the judge's behavior was so prejudicial to the substantial rights of the parties as to merit a reversal. At times, particularly in a criminal case, reversal will be mandatory.

3 J. Weinstein & M. Berger, *supra* at ¶ 605[04] at 605-14.

In *Price Bros. Co. v. Philadelphia Gear Corp.*, 629 F.2d 444 (6th Cir. 1980), the court applied Fed. R. Evid. 605 in considering the conduct of a judge in a bench trial. *Price Bros.* was an action for breach of contract and warranties concerning a pipe-wrapping machine manufactured by Price Brothers Company. The judge's law clerk visited Price Brothers' plant,

observed Price Brothers' malfunctioning pipe-wrapping machine, and, apparently, reported to the judge concerning the clerk's observations at the plant. The appeals court recognized the judicial duty to avoid off-the-record contacts that might be influential in the outcome of a bench trial and concluded:

> In a case analogous to the one before us, the Fifth Circuit reversed a jury verdict for the plaintiff where the trial court permitted its law clerk to testify to what he saw at a curiosity-inspired private view of the scene of a slip-and-fall injury. *Kennedy v. Great Atlantic & Pacific Tea Co.*, 551 F.2d 593 (5th Cir. 1977). . . . The trial judge repeatedly cautioned the jury not to attach any special significance to his law clerk's testimony. The Court of Appeals, nevertheless, held that it was required to vacate the judgment in the exercise of its supervisory power. . . . Reasoning that the finder of fact must be " 'free from external causes tending to disturb the exercise of deliberate and unbiased judgment,' " and that the courts must not tolerate " 'any ground of suspicion that the administration of justice has been interfered with,' " quoting *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), the appeals court concluded that the potential for prejudice resulting from the identification of the witness with the trial court was so great that the verdict could not be permitted to stand. . . .
>
> . . . .
>
> . . . The problem attendant to a judge having personal knowledge of the facts is that he may thereby be transformed into a witness for one party. Where the trial is to a jury, explicit rules provide some protection. If a judge is to preside, he may not testify. Rule 605, Fed.R.Evid. . . . A rule that merely prohibits a presiding judge from testifying in open court, however, does not insure that the fact finder will be "free from external causes tending to disturb the exercise of deliberate and unbiased judgment," [citation omitted], where the trial is to the bench. Whether, in a bench trial, a judge can avoid an involvement destructive of impartiality where he has personal knowledge of material facts in dispute is a

question that cannot be answered satisfactorily, *see* Advisory Committee's Notes, Rule 605, .Fed.R.Evid., and, therefore, a judge should recuse himself in such circumstances. [Citation omitted.]

629 F.2d at 446-47.

A trial judge's use of reports from a "monitoring-team," which included the trial judge, required reversal in *Cline v. Franklin Pork, Inc.*, 210 Neb. 238, 313 N.W.2d 667 (1981). This court stated in *Cline*:

> The purpose of Rule 605 was to avoid embarrassing the court, the hindrance of justice, scandals in the courts, and to avoid any appearance of impropriety or partiality. The reason that no objection is required is to eliminate the possibility of any hostility arising between the trial judge and counsel. . . . The functions of a judge and a witness are incompatible and it is utterly impossible for one to exercise the rights of a witness and to perform the duties of a judge at one and the same time.

210 Neb. at 244, 313 N.W.2d at 671.

In *Cline, supra,* this court observed that "[f]rom a practical point of view, it would be nearly impossible for the presiding judge to be cross-examined" on the reports utilized in the proceedings, *id.,* and concluded: "Can the parties waive the disqualification of the judge under § 27-605? We are persuaded that for the sake of the orderly administration of justice and meaningful review, they cannot." 210 Neb. at 246, 313 N.W.2d at 672.

> "Indeed, a judge presiding at a trial is not a competent witness, for the duties of a judge and a witness are incompatible. If he testifies he would have to pass upon the competency of his own testimony; and as a witness he might be regarded a partisan, and would be subject to embarrassing conflicts with counsel. The danger to the dignity of the bench, of subjecting its impartiality to doubt and of placing the defendant at an unfair disadvantage by admitting the presiding judge as a witness is very obvious."

*Tyler v. Swenson,* 427 F.2d 412, 415-16 (8th Cir. 1970) (quoting from *Lepper v. United States,* 233 F. 227 (4th Cir. 1916)

(Woods, Circuit Judge, concurring)). See, also, *State v. Eubanks*, 232 La. 289, 300, 94 So. 2d 262, 266 (1957) (trial court can refuse to testify regarding his method of selecting members of a grand jury, because "he could not act both as a judge and as a witness").

In *United States v. Heldt*, 668 F.2d 1238 (D.C. Cir. 1981), the appeals court considered a disqualification statute in determining whether the trial judge should have recused himself on the defendants' request. The pertinent part of 28 U.S.C. § 455 (1982) provided:

> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

> (b) He shall also disqualify himself in the following circumstances:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . .

Acknowledging the rule adopted in several other circuits, the District of Columbia circuit held:

> [A] showing of an *appearance* of bias or prejudice sufficient to permit the average citizen reasonably to question a judge's impartiality is all that must be demonstrated to compel recusal under section 455. A showing of the appearance of bias or prejudice would seem necessarily to raise a reasonable question concerning the judge's impartiality.

(Emphasis in original.) 668 F.2d at 1271.

If a trial judge were allowed to testify concerning a matter in the proceedings over which that judge was presiding, then, in Alice's words in Alice's Adventures in Wonderland, the situation becomes "Curiouser and curiouser!" Weinstein makes the acute observation: "Permitting a judge to testify raises perplexing questions of who will rule on objections, who will compel answers, what will be the scope of cross-examination, and how counsel is to maintain a proper relationship with the court." 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 605[01] at 605-4 (1987). On the other hand, if the trial judge's comments about his conduct cannot be

challenged, the judge's comments are, in effect, a soliloquy shared with counsel. Thus, the bar or disqualification under Neb. Evid. R. 605 spares a litigant from the dilemma of allowing a judge's prejudicial testimony to remain unchallenged or, by questioning the judge, risking the wrath of a judge whose impartiality has been attacked.

In Barker's case, whether the sentencing judge was influenced by his meeting with the victim's family became the crucial question. Basically, the question is: Did the sentencing judge have some preconceived opinion or disposition toward the sentence to be imposed on Barker? Although other participants in the questioned meeting might have provided some information, the judge's "testimony" was extremely important, if not indispensable, in establishing an accurate and complete portrayal of events and statements during the visit with the victim's family. In the final analysis, who other than the judge could better testify about the judge's attitude or mental disposition toward sentencing in this case? At that point, the judge, unfortunately but necessarily, was required to assume dual and simultaneous roles—witness and judge—and perhaps quite naturally required to assume the ultimate role of advocate in defense of his own impartiality which had been brought into question. Those incompatible roles, witness as well as judge, are inconsistent with and even antagonistic to a fair and safe administration of criminal justice.

Moreover, imposing a burden on a litigant to prove prejudice through the testimony of one disqualified from testifying is an impossible standard. In Barker's case, obtaining the judge's testimony concerning his attitude or disposition toward sentencing contravenes the testimonial bar and witness disqualification imposed by Neb. Evid. R. 605. Yet, without the judge's testimony, the question about the judge's possible prejudice could not be resolved, irresolution which thereby prevented determining whether Barker was sentenced by an impartial court.

Also, as a matter of judicial economy, the problem of trials within trials, such as a hearing to determine whether a judge was improperly influenced by an ex parte communication initiated or invited by the judge, ought to be avoided and

eliminated if possible. We believe that the recusal rule we have adopted today will help solve such a problem by discouraging the cause of the problem.

We realize that the Nebraska Evidence Rules are inapplicable at a sentence hearing. See Neb. Evid. R. 1101(4)(b) (Neb. Rev. Stat. § 27-1101(4)(b) (Reissue 1985)). See, also, *State v. Dillon*, 222 Neb. 131, 382 N.W.2d 353 (1986). However, the question about the judge's prejudice arose at a hearing distinct from the sentencing and involved a question about impartiality of the one who would impose sentence rather than a question about the type of sentence which would be appropriate in a given case.

Most assuredly, we appreciate the trial judge's predicament precipitated by the prosecutor in this case. The judge's declination of the meeting would have the appearance of absolute apathy for the distraught family. However, we must also appreciate that an appearance of partiality from the meeting immeasurably outweighs any appearance of insensitivity.

Consequently, we set aside the sentence imposed on Barker and remand this matter to the district court for further proceedings, namely, a sentence hearing to be conducted and sentence imposed by a judge other than the judge who imposed sentence on Barker.

SENTENCE VACATED, AND CAUSE
REMANDED WITH DIRECTION.

BOSLAUGH, J., concurring.

I concur in the judgment of the court and that part of the opinion which holds that a judge should not initiate or invite an ex parte communication concerning a pending or impending proceeding.

Although the majority opinion does not hold that a judge may not consider an ex parte communication concerning a proceeding pending before him, the opinion appears to rely to some extent upon authorities to that effect.

I think it is important to remember that presentence reports consist largely of hearsay and ex parte statements, all of which are proper for consideration by the court. In *State v. Rose*, 183 Neb. 809, 164 N.W.2d 646 (1969), we noted that a trial judge has a broad discretion in the source and type of evidence he may

use to assist him in determining the kind and extent of punishment to be imposed.

> Highly relevant, if not essential, to his determination of an appropriate sentence is the gaining of knowledge concerning defendant's life, character, and previous conduct. In gaining this information, the trial court may consider reports of probation officers, police reports, affidavits, and other information including his own observations of the defendant. A presentence investigation has nothing to do with the issue of guilt. The rules governing due process with respect to the admissibility of evidence are not the same in a presentence hearing as in a trial in which guilt or innocence is the issue. The latitude allowed a sentencing judge at a presentence hearing to determine the nature and length of punishment, other than in recidivist cases, is almost without limitation as long as it is relevant to the issue.

(Citations omitted.) *Id.* at 811, 164 N.W.2d at 648-49.

The rules of evidence and the right of confrontation do not apply to sentencing proceedings. As the U.S. Supreme Court held in *Williams v. New York*, 337 U.S. 241, 246-47, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949):

> Tribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. Out-of-court affidavits have been used frequently, and of course in the smaller communities sentencing judges naturally have in mind their knowledge of the personalities and backgrounds of convicted offenders. . . .
>
> . . . A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an

appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.

COLWELL, D.J., Retired, joins in this concurrence.